**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MELISSA SMITH,

                Plaintiff,

vs.                                  Case No. 6:11-cv-1110-Orl-37KRS

CITY OF NEW SMYRNA BEACH,

                Defendant.

_____

**ORDER**

This cause is before the Court on the following:

1.      Defendant, City of New Smyrna Beach's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 47), filed September 11, 2012;

2.      Plaintiff's Response to Defendant, City of New Smyrna Beach's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 58), filed October 22, 2012; and

3.      Defendant, City of New Smyrna Beach's Reply to Plaintiff's Response to Summary Judgment and Incorporated Memorandum of Law (Doc. 66), filed November 9, 2012.

Upon consideration, the Court hereby denies the motion.

**BACKGROUND**[1]

Plaintiff Melissa Smith was a firefighter/paramedic for the City of New Smyrna

_____

[1] The Court derives the factual allegations in this Order from the parties' exhibits, Plaintiff's deposition testimony, and Plaintiff's and Deputy Chief David McCallister's declarations, and construes them in the light most favorable to Plaintiff. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

Beach Fire Department from 2003 to 2008. (Doc. 48-5, p. 2.) Plaintiff asserts that throughout her career at the Fire Department, she was discriminated against on the basis of her sex and subject to a hostile sexual work environment. (Doc. 1.) Defendant City of New Smyrna Beach ("the City") disciplined Plaintiff for various violations of City policies and regulations on a number of occasions. (*See, e.g.*, Doc. 49-17, pp. 4–8; Doc. 49-18; Doc. 49-22, p. 5; Doc. 49-24, pp. 5, 12; Doc. 49-26; Doc. 49-30; Smith Dep. 229:4–7, 237:12–238:21, 282:20–288:1.) Plaintiff made numerous complaints to various City personnel and management about discrimination and harassment. (*See, e.g.*, Smith Decl. ¶ 5; Smith Dep. 64:12–67:17, 68:6–70:25, 81:4–7, 162:1–13.) After an incident in which Plaintiff was charged with insubordination and willful neglect in the performance of duties, the City indefinitely suspended Plaintiff on January 18, 2008 and ultimately terminated her employment on April 15, 2008. (Doc. 49-26; Doc. 49-30.)

Plaintiff brought sex discrimination and retaliation claims pursuant to both Title VII and the Florida Civil Rights Act (FCRA).[2] (Doc. 1.) The City moved for summary judgment. (Doc. 47.) Plaintiff opposed. (Doc. 58.)

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[2] The Court will analyze the claims under Title VII as the Title VII analysis guides the FCRA analysis. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under [FCRA], because the Florida act was patterned after Title VII."); *see also Holland v. Gee*, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012) (stating that although a FCRA claim was asserted, the court would proceed under a Title VII analysis).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality of the facts depends on the substantive law applicable to the case. *See id.* To defeat a motion for summary judgment, the nonmoving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citation omitted).

## DISCUSSION

The Court addresses each of Plaintiff's claims: (1) sex discrimination, under which the Court discusses the tangible employment action and hostile work environment theories separately; and (2) retaliation.

### 1. Sex Discrimination

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The statute and accompanying case law organize discrimination into two categories." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010). The first category is disparate treatment, in which an employer discriminates against an employee with respect to her compensation, terms, conditions, or privileges of employment because of her membership in a protected class. *Id.* The second category is disparate impact, in which a facially neutral employment practice has a significant adverse effect on a protected class. *Id.*

At issue in the present case is disparate treatment, which can take two forms:

(1) a discriminatory, tangible employment action such as a discharge or suspension; or (2) a hostile work environment that changes an employee's terms and conditions of employment. *See id.* Plaintiff brings her sex discrimination claims under both theories.[3]

### a. Tangible Employment Action

A plaintiff may establish sex discrimination by either direct or circumstantial evidence. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). "In the usual case, however, direct evidence is not present, and the plaintiff must rely on circumstantial evidence to prove discriminatory intent." *Id.* In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court articulated a burden-shifting framework for proving disparate treatment on the basis of circumstantial evidence.

Initially, the plaintiff bears the burden of showing that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) her employer treated her less favorably than other similarly situated individuals outside of her protected class; and (4) she was qualified for her job. *Id.* at 802; *Marshall v. Mayor Alderman*, 366 F. App'x 91, 98 (11th Cir. 2010).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *McDonnell Douglas*, 411 U.S. at 802–03; *Holifield*, 115 F.3d at 1564. If the defendant meets this

---

[3] The Court considers Plaintiff to have brought her claims under both the tangible employment action and hostile work environment theories. In the Complaint, the tangible employment action theory is not pled with particularity, as Counts I and III are titled "Sex [D]iscrimination [U]nder Title VII – Hostile Environment" and "Sex Discrimination Under the FCRA – Hostile Environment." (Doc. 1, pp. 18, 22.) However, both parties briefed the tangible employment action theory (Doc. 47, pp. 15–19, Doc, 58, p. 13, Doc. 66, pp. 1–9) and the Court agrees that the theory was intended by the pleadings, as numerous factual allegations in the Complaint go to the issue despite the titling of the claims. *Cf. Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004) (stating that a plaintiff was not "required to plead tangible employment action as a separate claim [from sexual harassment], because it is not a separate claim").

burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reason is "a mere pretext for discrimination." *Holifield*, 115 F.3d at 1565.

### i. *Prima Facie* Case

Here, the parties do not dispute that Plaintiff is a woman and that she suffered an adverse employment action. The parties do disagree, however, as to whether Plaintiff was treated less favorably than similarly situated male employees and whether she was qualified for her job.

### 1. Similarly Situated Non-Class Members' Treatment

To establish a *prima facie* case of disparate treatment under a tangible employment action theory, a plaintiff must show that her "employer treated similarly situated employees outside [her] classification more favorably than herself." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Employees must be "similarly situated in all relevant respects. . . . In determining whether employees are similarly situated[,] . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* A plaintiff must also show that "the person imposing discipline knew of the comparator's alleged misconduct 'and that the known violations were consciously overlooked.'" *Marshall v. Mayor Alderman*, 366 F. App'x 91, 98 (11th Cir. 2010) (quoting *Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989)).

On October 11, 2007, Plaintiff was suspended for allegedly cursing at the Fire Department administration. (Doc. 49-22, p. 5.) The incident for which she was suspended occurred on August 22, 2007. (*Id.* at 1.) Lieutenant Tyrone Ofide reported Plaintiff to Chief Kyle Wofford for saying "they can kiss my a—" when firefighter/paramedic Scott Kirsch informed Plaintiff of a new Fire Department policy.

(*Id.* at 2.) Plaintiff maintains that she was not on duty yet when the incident occurred (*Id.* at 8) and that firefighter/paramedic Kirsch approached her in an "aggressive confrontational manner" and was being "verbally abusive" (*Id.* at 15). She contends that she told firefighter/paramedic Kirsch to "kiss [her] ass" because he was harassing her; she says that she did not say "they can kiss my ass" to the administration. (*Id.* at 8, 10–11.)

The Fire Department determined that Plaintiff's use of profanity was directed toward the administration, despite Plaintiff's claim that it was directed merely at firefighter/paramedic Kirsch, resulting in her suspension. (*Id.* at 5.) Plaintiff stated that Lieutenant Ofide curses on duty and others have cursed on numerous occasions with Lieutenant Ofide present, and that no one else has been disciplined for cursing. (*Id.* at 16.) Plaintiff also stated that "[c]ursing was not a foreign language" among employees. (Smith Dep. 343:1–20.) Plaintiff said that firefighter/paramedic Kirsch curses around her. (*Id.* at 343:1–20.) Plaintiff also said that she can probably say that "every" male firefighter uses profanity at work and that even Fire Chief Hawver, Chief Wofford, and Chief McCallister use profanity. (*Id.* at 490:12–24.)

There are conflicting accounts as to what Plaintiff said and to whom she said it. Given these conflicting accounts, whether Plaintiff directed her profanity at the administration is a question for the factfinder. If the most she was "guilty" of was cursing generally, not at the administration, then a reasonable factfinder could find that she was treated less favorably than her male counterparts,[4] who allegedly curse all the time but

---

[4] The Court declines to determine whether Fire Chief Hawver, Chief Wofford, Chief McCallister, and Lieutenant Ofide were, in fact, similarly situated comparators despite their higher rank than Plaintiff. The fact that "others [cursed] with Ofide present" on "numerous occasions" (Doc. 49-22, p. 16), that "every" male firefighter cursed (Smith

are not disciplined for it (Smith Dep. 491:7–9). As such, Plaintiff has established a *prima facie* case of a discriminatory tangible employment action.[5]

## 2.  Qualification for Job

The City argues that Plaintiff cannot make out a *prima facie* case because she was not qualified for her job at the time she was suspended for the profanity incident. Specifically, the City argues that Plaintiff was not qualified for her job because her paramedic privileges were eventually suspended and thus she could not serve in her firefighter/paramedic role.[6] (Doc. 47, pp. 16–17.) Despite the City's arguments, the Court finds that Plaintiff was qualified for her job. Plaintiff's suspension stemming from the profanity incident was imposed on October 11, 2007. (Doc. 60-11, p. 6.) Plaintiff's ability to work as a paramedic was not revoked until January 16, 2008. (Doc. 60-14.) Thus, Plaintiff was fully qualified for her position at the time that the suspension for the profanity incident was imposed. *Cf. Crapp v. City of Miami Beach*, 242 F.3d 1017,

---

Dep. 490:12–15), and that Kirsch, a firefighter/paramedic who shared the same rank as Plaintiff (Doc. 49-22, p. 4), cursed (Smith Dep. 343:1–20) is enough to demonstrate that Plaintiff was treated differently from similarly situated male counterparts.

[5] The Court notes that the parties also briefed an incident in which Plaintiff was suspended for insubordination and willful neglect in the performance of duties in relation to her response to an automobile accident. (*See* Doc. 47, p. 16; Doc. 58, p. 16.) The Court does not address the automobile accident incident because Plaintiff has set out a *prima facie* case regarding the profanity incident. However, the Court does note that Plaintiff does not present a similarly situated comparator for the purposes of establishing a *prima facie* case based on the automobile accident incident, as nothing in the record indicates that the male employees Plaintiff offers as comparators acted insubordinately. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges."); *see also Cuevas v. American Express Travel Related Servs. Co.*, 256 F. App'x 241, 243 (11th Cir. 2007) (recognizing that the "nearly identical" standard is controlling despite a detour from that standard in *Alexander v. Fulton County*, 207 F.3d 1303 (11th Cir. 2000)).

[6] Volusia County EMS Medical Director Dr. Peter Springer suspended Plaintiff's ability to work as a paramedic under his medical license following the automobile accident incident. (Doc. 49-25.)

1020–21 (11th Cir. 2001) (concluding that a law enforcement agency's retroactive suspension of a police officer's certification did not vitiate the officer's *prima facie* case because the officer was certified at the time the agency made the decision to fire him).

### ii. Legitimate, Nondiscriminatory Reason

Because Plaintiff established the *prima facie* elements regarding her suspension for the profanity incident, the burden shifts to the City to demonstrate that the adverse employment action was taken for legitimate, nondiscriminatory reasons. Plaintiff's profanity was characterized as a violation of the Fire Department's Personnel Policies and Procedures for "[i]mmoral, unlawful or improper" behavior which would "tend to effect [sic] the employee's . . . reputation or goodwill in the community." (Doc. 49-22, p. 7.) If Plaintiff was indeed suspended for this reason, then it would be a legitimate, nondiscriminatory one. Thus, the City has met its burden.

### iii. Pretext

Because the City met its burden in positing a legitimate reason for the adverse employment action, the burden shifts back to Plaintiff to demonstrate that the City's articulated reason is "a mere pretext for discrimination." *Holifield*, 115 F.3d at 1565. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Thus, a plaintiff's [*prima facie*] case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit a trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147–48 (2000). Thus, a plaintiff may develop an inferential case to show that a rational factfinder could conclude that the employment action was discriminatory. *See*

*id.* at 148.[7]

In addition to the foregoing, Plaintiff presents evidence that two shifts prior to the one during which she made the "kiss my ass" remark, she said "shit" when she dropped her sandwich on the floor and that Lieutenant Ofide responded that "a lady should not talk like that." (Doc. 492-2, p. 16.) This gender-driven comment, paired with statements that cursing was prevalent in the Fire Department yet only Plaintiff was disciplined for profanity, could lead a reasonable factfinder to infer that Plaintiff's suspension was discriminatory and that the City's explanation was pretextual.

As such, factual issues remain and summary judgment is denied as to the sex discrimination claim based on the tangible employment action theory.

### b.  Hostile Work Environment

To prove a hostile work environment, a plaintiff must show: (1) that she is a member of a protected class; (2) that she was subject to unwelcome conduct; (3) that the conduct was based on her sex; (4) that the conduct was sufficiently severe or

---

[7] The City argues that an arbitration proceeding between Plaintiff's union and the City precludes Plaintiff's claim of pretext. (Doc. 66, pp. 8–9.) Plaintiff challenged, *inter alia*, the discipline imposed on her for the profanity incident. (Doc. 49-33, pp. 1–2.) Pursuant to the collective bargaining agreement between Plaintiff's union and the City, her grievances went to arbitration. (Doc. 49-33.) The arbitrator denied Plaintiff's grievances with the exception that the City should have allowed Plaintiff to use her personal leave for her suspension in relation to the profanity incident. (*Id.* at 29.)

The present action is not precluded by the prior arbitration. First, the arbitration did not address Plaintiff's claim of sex discrimination but instead dealt with whether the disciplinary actions against her were taken pursuant to just cause. (*Id.* at 14.) Though the collective bargaining agreement at issue includes a nondiscrimination section (Doc. 49-5, p. 5), that section was not relevant to the arbitration. (Doc. 49-33, pp. 14–16 (citing the "[r]elevant [p]ortions" of the labor agreement as the Employer Rights, Rules and Regulations, and Grievance and Arbitration Procedures sections).) Second, even if the arbitration proceeding was brought pursuant to the nondiscrimination clause, which it was not, the U.S. Supreme Court has held that an employee's statutory right to a trial under Title VII is not foreclosed by prior arbitration under a nondiscrimination clause of a collective bargaining agreement. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59–60 (1974). Thus, the arbitration proceeding does not preclude Plaintiff's claim of pretext.

pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding her employer liable. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). Here, the issues are whether Plaintiff was subject to unwelcome conduct, whether that conduct was based on her sex, whether the conduct was sufficiently severe or pervasive, and the basis on which the City can be held liable.

The Eleventh Circuit has articulated several principles of employment discrimination in relation to hostile work environment claims. First, "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in terms and conditions of employment." *Id.* at 807. Second, the conduct at issue must be viewed "cumulatively, and in its social context" rather than in isolation. *Id.* Third, "a plaintiff can prove hostile work environment by showing severe or pervasive discrimination directed against her protected group, even if she herself is not individually singled out in the offensive conduct." *Id.*

### i. Unwelcome Conduct

Plaintiff presents evidence that she was subject to unwelcome conduct on numerous occasions throughout her tenure at the Fire Department. In Plaintiff's job interview, Fire Chief Tim Hawver asked Plaintiff questions about being a single mom, talked with her about the "mothering role," and stated that she reminded him of his daughter. (Smith Dep. 28:18–30:2.) He also said that he normally only hires men who hunt, fish, or camp. (*Id.* at 30:3–9.) When Fire Chief Hawver's granddaughter visited the station, Fire Chief Hawver chose Plaintiff to watch the granddaughter out of everyone at the fire station. (*Id.* at 255:8–256:7.)

Within Plaintiff's first month on the job, individuals within the Fire Department

covered Plaintiff's operating procedures book with cut-out pieces of a photocopied *Cosmopolitan* magazine. (*Id.* at 263:11–20.)

Chief Michael Coats ignored Plaintiff, rarely conversed with her, and did not direct attention toward her, which she took as him being "uncomfortable with [Plaintiff] being a woman."[8] (*Id.* at 228:5–19.) Chief Coats also stated that "women should not be in the fire service" and that it was "up to [Plaintiff] to prove otherwise." (*Id.* at 200:13–16.) In response, Lieutenant Paul Owens laughed and agreed with Chief Coats. (*Id.* at 201:12–13.) Chief Coats also stated, "[I]f you don't fear me, you won't respect me." (*Id.* at 200:18–19, 201:19–22.) On another occasion, he said that women should be "in the kitchen." (*Id.* at 382:21–383:3.)

When Plaintiff told Chief David McCallister about the sexual harassment she was experiencing from Chief Coats, Chief McCallister told her that she should file a hostile work environment claim, but that it "would make [her] career very tough." (*Id.* at 162:1–13.) Chief McCallister said that he wanted Plaintiff to get pregnant so that she could be his secretary. (*Id.* at 349:5–6.)

Firefighter/EMT James Roberts told Plaintiff how hot and beautiful she was. (*Id.* at 214:7–8.) He invited her to strip clubs (*Id.* at 214:11) and said, "I'd like to bend you over." (*Id.* at 215:3.) At first, Plaintiff considered him a friend, but his behavior escalated. (*Id.* at 215:5–15.) He made comments to her depending on her attire and sent her a picture of his penis. (216:7–13.) Plaintiff talked to firefighter/EMT Roberts about stopping the unwelcome conduct (*id.* at 218:2–3), and after a few conversations (*id.* at

---

[8] The Court notes that this conduct is based on Plaintiff's subjective interpretation, but includes it to contextualize the "totality of the circumstances." *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1255–57 (11th Cir. 1999) (Carnes, J., concurring) (stating that courts should be reluctant to let plaintiffs rely on their "subjective interpretations of ambiguous conduct"); *id.* at 1246.

218:15–18) he ceased, though the conduct may have continued into 2006 (*id.* at 219:17–20). One could view firefighter/EMT Roberts's conduct as an isolated incident stemming from a single coworker that took place over a discrete period of time and ended without the City's involvement. At the same time, construed in the light most favorable to Plaintiff, it could also be seen as symptomatic of a larger hostile work environment that condones sexual harassment.

Lieutenant Paul Owens called Plaintiff "kid." (*Id.* at 226:17–20.) When asked why being referred to as "kid" was based on her gender, Plaintiff stated that "all the other firefighters were referred to by their name or by their rank. And I was belittled and treated not of equal worth as the men." (*Id.* at 227:13–18.) When Plaintiff and another female firefighter were assigned to Lieutenant Owens's shift, Lieutenant Owens said, "[T]here is no way I am working with two females. . . . I am not babysitting two girls." (Smith Decl. ¶ 3.)

After Chief Wofford found a box of Plaintiff's tampons, Lieutenant Brian Grace told Plaintiff that if she ever brought tampons to work again, she would be suspended. (Smith Decl. ¶ 6; Smith Dep. 71:25–72:3.) On one occasion, Lieutenant Grace made Plaintiff scrub the toilets at the fire station in front of male firefighters and told her that if she "did not get all of the urine off the walls of the urinals, he would make [her] do it again." (Smith Decl. ¶ 16; Smith Dep. 77:16–18; 78:24–25.)

Plaintiff was so emotionally disturbed by her treatment that she had to leave work on multiple occasions (Smith Decl. ¶¶ 11, 16; Smith Dep. 192:4–12), and on one occasion she became physically ill. (Smith Decl. ¶ 16). She was also "too emotionally unstable to stay on as the lead paramedic and driver. (Smith Dep. 192:4–14.) She attributes a pregnancy miscarriage to "the stress that resulted from the harassment."

(Smith Decl. ¶ 14.)

The Court finds that Plaintiff was subject to unwelcome conduct.

### ii.  Conduct Based on Sex

In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), the U.S. Supreme Court outlined three ways that a plaintiff can show that the conduct to which she was allegedly subject was based on sex. She may show: (1) that the challenged conduct was motivated by sexual desire; (2) that she was harassed "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace"; or (3) "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80–81.

Here, Plaintiff has shown that the unwelcome conduct she faced was based on her sex. Many comments directed at Plaintiff demonstrated a general hostility to women in the workplace, such as the comments that women should not be in the fire service but in the kitchen and the comment that Plaintiff should get pregnant so she could work as a secretary rather than a firefighter. Other incidents and comments are clearly sex-based, such as the direction that she was not allowed to bring tampons to work, the discussions of Plaintiff's mothering role, and a lieutenant's refusal to work with her because it would be "babysitting [a] girl[]." Other conduct appears to have been motivated by sexual desire, such as the comments that Plaintiff was hot, that a coworker wanted to "bend [Plaintiff] over," and a coworker's emailing of pictures of his penis to Plaintiff. While certain conduct such as calling Plaintiff "kid" and saying "if you don't fear me, you won't respect me" are not plainly sex-based, taken cumulatively and in the social context of all of the unwelcome conduct, *see Reeves*, 594 F.3d at 807–08,

such conduct could be construed as part of the greater hostile sexual work environment. Plaintiff has presented sufficient evidence that the unwelcome conduct was based on sex to survive a motion for summary judgment.

### iii.  Sufficiently Severe or Pervasive to Alter Terms and Conditions of Employment and Create Abusive Working Environment

Whether an environment is abusive must be determined by examining all of the circumstances, including: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The environment need not be "psychologically injurious," but the conduct must be both objectively and subjectively hostile. *Id.* at 21–22. Objective hostility involves "an environment that a reasonable person would find hostile or abusive." *Id.* at 21.

The conduct that Plaintiff faced was sufficiently severe to alter the terms and conditions of her employment. Plaintiff subjectively felt that she was subject to a hostile work environment. On multiple occasions, Plaintiff was so disturbed by her treatment by the City that she had to leave work. (Smith Decl. ¶¶ 11, 16; Smith Dep. 192:4–12.) On one occasion, she became physically ill from the harassment. (Smith Decl. ¶ 16). She also became too emotionally unstable to stay on as the lead paramedic and driver. (Smith Dep. 192:4–14.) The Court finds that the unwelcome conduct that Plaintiff faced was objectively hostile as well. Under the frequency prong, the conduct occurred on numerous occasions from a number of people in the Fire Department from firefighters all the way up through the ranks of lieutenants, chiefs, and the Fire Chief. Under the severity prong, the conduct ranged from the mild end of being ignored to the more

severe end of being subject to sexually explicit and derogatory remarks, being told outright that she did not belong in the fire service, having a lieutenant refuse to work with her because of her sex, being forbidden from bringing female sanitary items to work and receiving a photograph of a coworker's penis. Under the physically threatening or humiliating prong, while the conduct may not have been physically threatening, certain acts, such as having her book covered in pieces of *Cosmopolitan* magazine, being singled out to watch Fire Chief Hawver's granddaughter, being told she cannot bring tampons to work, having a lieutenant refuse to work with her because of her sex, and being forced to scrub toilets while male coworkers watched are arguably humiliating. Under the unreasonable interference with work performance prong, the kind of degradation Plaintiff experienced, especially the comments that women do not belong in the fire service, implying that women cannot perform in the role as a firefighter, could be seen to unreasonably affect one's work performance.

Given the frequency and severity of the unwelcome conduct, the humiliation, and the unreasonable interference with Plaintiff's performance, under the totality of the circumstances, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citation omitted), a reasonable factfinder could conclude that the harassment was sufficiently severe to alter the terms and conditions of Plaintiff's employment.

### iv.  Basis for Holding Employer Liable

The test for employer liability depends on whether the harasser is a supervisor or a coworker. A supervisor is not someone who merely oversees an employee's job performance, but is someone who has "the power directly to affect the terms and conditions of the plaintiff's employment." *Bryant v. Jones*, 575 F.3d 1281, 1300 (11th Cir. 2009) (citation omitted). A coworker "cannot dock another's pay, nor can one

[coworker] demote another. . . . The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). Here, many of the individuals who engaged in harassing conduct outrank Plaintiff in the chain of command, but they are not "supervisors" for the purposes of Title VII. That term is reserved for Fire Chief Hawver and City Manager Hagood, the individuals who had authority to suspend and terminate Plaintiff. (*See, e.g.*, Doc. 49-22, p. 18; Doc. 49-28; Doc. 49-30.)

"Employer liability in a case involving sexual harassment by [coworkers] exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000) (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)). Employer liability for coworker harassment thus involves two elements: (1) notice; and (2) failure to act.

"Actual notice is established by proof that management knew of the harassment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) (citation omitted). "Constructive notice . . . is established when the harassment was so severe and pervasive that management reasonably should have known of it." *Id.* (citation omitted). Here, the City was on actual notice of the harassing conduct because Plaintiff complained to numerous personnel and members of management about the hostile work environment to which she was allegedly subject. She complained to Human Resources Director Carol Hargy on a number of occasions. (Smith Dep. 64:12–67:17, 81:4–7; Smith Decl. ¶¶ 5, 11–13.) Plaintiff also told Fire Chief Hawver, Chief McCallister, Chief Coats, Chief West, Lieutenant Richenberg, and Lieutenant Ofide,

among others, about the harassment. (Smith Dep. 68:6–70:25.) The fire department's Rules and Regulations specifically state that an employee should report sexual harassment, orally or in writing, to an immediate supervisor, the Fire Chief, the Assistant Fire Chief, or the Personnel Officer. (Doc. 49-3, p. 53.) Because Plaintiff followed this procedure by bringing complaints to immediate supervisors (in the colloquial sense) and the Fire Chief, the City was on actual notice of sexual harassment by coworkers. *See Breda*, 222 F.3d at 889 ("When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, the employer's notice of the harassment is established by the terms of the policy.")

If an employer is on notice of harassment, it must take "immediate and appropriate corrective action" in order to avoid liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002). Here, Plaintiff presents evidence that creates a fact issue as to whether the City took remedial action. Smith stated that she told numerous personnel and members of management about the hostile work environment before an October 2007 meeting with Human Resources Director Hargy. (Smith Dep. 68:6–70:25; Smith Decl. ¶ 5.) There is no evidence that the City took steps to investigate or remedy the alleged sexual harassment. Indeed, Plaintiff testified that City Manager Hagood was "appalled" and "disgusted" that the "sexual discrimination had gone on this long and that no one had stuck up for [Plaintiff]" (Smith Dep. 357:2–358:15) at a meeting that occurred between October 2007 and January 2008.[9] Plaintiff thus presents evidence from which a reasonable jury could conclude that the City failed to take immediate and corrective action.[10]

---

[9] *See infra* note 12.

[10] The City did swiftly respond to a complaint Plaintiff made about an email

Thus, a genuine factual dispute exists as to whether liability can be imposed on the City because Plaintiff presented evidence that the City was on notice of the harassing conduct and failed to take remedial action.[11] As such, summary judgment for the sex discrimination claim pursuant to the hostile work environment theory is due to be denied.

## 2. Retaliation

Title VII provides that it is unlawful for an employer "to discriminate against [an employee] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff alleges that she engaged in protected activity by "[c]omplaining several times about discrimination, harassment, a hostile work environment and retaliation" and that doing so "was a substantial motivating factor in the decision to suspend [her] indefinitely and ultimately terminate her." (Doc. 1, ¶¶ 38(a), 40.)

To establish a *prima facie* case of Title VII retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) there is a causal connection between the protected activity and the adverse action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998). If a

---

containing sexual content that Lieutenant Ofide left on a work computer. (Doc. 60-2, p. 2.) However, this was one incident, and Plaintiff's multiple complaints about the alleged pattern of sex discrimination and hostile work environment went unaddressed.

[11] The City argues that it is entitled to a *Faragher-Ellerth* defense. (Doc. 47, pp. 22–23.) *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998). However, a *Faragher-Ellerth* defense only applies to an employer's vicarious liability for sexual harassment by a supervisor. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Beckford v. Dep't of Corr.*, 605 F.3d 951, 961 (11th Cir. 2010). Since liability can be imposed on the City on the basis of coworker harassment, the Court does not address liability based on supervisory harassment or the *Faragher-Ellerth* defense.

plaintiff makes out a *prima facie* case of retaliation, the burden is on the defendant to produce "legitimate reasons for the adverse employment action." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002) (internal quotation marks and citation omitted). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Id.* (citation omitted).

   **a. *Prima Facie* Case**

   **i. Protected Activity**

   Under 42 U.S.C. § 2000e-3(a), there are two types of statutorily protected activity that may form the basis of a retaliation claim: (1) activity stemming from the participation clause of the statute, which protects an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"; and (2) activity stemming from the opposition clause, which protects an employee who "has opposed any practice made an unlawful employment practice by this subchapter." An employee who seeks protection under the opposition clause must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices" and "the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–12 (11th Cir. 2002) (internal quotation marks and citations omitted).

   In addition to the numerous City personnel and management to whom Plaintiff complained throughout her tenure at the Fire Department (Smith Dep. 64:12–67:17, 68:6–70:25, 81:4–7, 162:1–13), she also complained to City Manager Hagood about the sexual harassment she allegedly experienced sometime between October 21, 2007 and

January 19, 2008. (Smith Dep. 356:10–358:15, 445:2–8.)[12] As discussed above, a reasonable factfinder could objectively find that she was subject to sexual harassment in the form of a hostile work environment and thus that her belief that she was subject to an unlawful employment practice was reasonable. Thus, Plaintiff engaged in protected activity when she complained of sexual harassment to City Manager Hagood.

### ii.  Adverse Action

To prove adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse" such that a reasonable employee might have been dissuaded from engaging in the protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Here, Plaintiff was suspended and terminated. Both are employment actions materially adverse enough to support a claim of retaliation. *See Burlington N.*, 548 U.S. at 73 ("A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent . . . .").

### iii.  Causal Connection

In order to establish a causal connection, a plaintiff must establish that the protected activity and the adverse action "are not completely unrelated." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (internal quotation marks

---

[12] Plaintiff recounted that she discussed "all of the issues, [her] entire career" at this meeting (Smith Dep. 357:16–18), including "the harassment," "the sexual discrimination," and the tampon incident (Smith Dep. 358:1–12.) The tampon incident occurred on October 21, 2007. (Smith Decl. ¶ 3.) When asked when the meeting at which Plaintiff discussed her "entire employment" with City Manager Hagood took place, Plaintiff said that it occurred before January 19, 2008. (Smith Dep. 445:2–8.) Construed in the light most favorable to Plaintiff, this evidence establishes that a meeting wherein Plaintiff complained to City Manager Hagood about sexual harassment occurred between October 21, 2007 and January 19, 2008.

and citation omitted). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough. . . . [I]f there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.*

In the instant case, Plaintiff presented evidence that she engaged in protected activity between October 21, 2007 and January 19, 2008. (Smith Dep. 356:10–358:15, 445:2–8.) Plaintiff was indefinitely suspended on January 18, 2008. (Doc. 49-26.) Because there was an interval of less than three months between the protected activity and suspension, Plaintiff establishes a causal connection.

The Court thus concludes that Plaintiff presented sufficient evidence to establish a *prima facie* case of retaliation.

### b. **Legitimate Reasons**

If the plaintiff makes out a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997) (internal quotation marks and citation omitted). The City presented evidence that the adverse actions to which Plaintiff was subject were done for the legitimate reasons that Plaintiff: (1) was insubordinate during the automobile accident incident; (2) could no longer work as a paramedic; and (3) received multiple

suspensions for violations in the past.[13] (Doc. 49-28.) These proffered justifications are sufficient to meet the City's burden of demonstrating legitimate reasons for the adverse actions.

### c. Pretext

"If the defendant offers legitimate reasons, the presumption of retaliation disappears" and "[t]he plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citations omitted). The Court addresses each of the City's posited legitimate reasons in turn.

As to the reason that Plaintiff was insubordinate, Plaintiff introduced evidence that she was not insubordinate because the orders to assist with a particular patient were not directed at her. (Doc. 49-24, p. 16.) Chief Wofford commended Plaintiff (Doc. 49-24, p. 16) and Dr. Springer told her that she had done nothing wrong (Smith Dep. 417:9–418:9). She was also not told until a week after the incident that she acted insubordinately. (Doc. 49-24, p. 16.) A reasonable jury could infer that adverse action was taken against Plaintiff not because she was actually insubordinate, but out of a retaliatory motive.

As to the reason that Plaintiff could no longer work as a paramedic, Plaintiff introduced evidence that she could have worked as an EMT despite being temporarily disqualified from working as a paramedic. Dr. Springer said that he would allow her to

---

[13] Fire Chief Hawver referenced: (1) a 24-hour suspension on October 15, 2007; (2) a 48-hour suspension on October 18 and 30, 2007; and (3) a 24-hour suspension on December 18, 2006. While evidence of the specific dates on which Plaintiff served her 2007 suspensions is not in the record, the Court understands these suspensions to correspond to (1) the profanity incident (*See* Doc. 49-22, p. 5); (2) the automobile accident incident (*See* Doc. 49-24, pp. 28–29); and (3) the hazardous materials class incident (*See* Doc. 49-17, pp. 6–7), respectively.

work as an EMT or firefighter, just not as a paramedic until she met the three criteria he set out. (Doc. 60-16.)  Plaintiff testified that the State Department of Health emailed the Fire Department to inform the Fire Department that Plaintiff could still work as an EMT. (Smith Dep. 426:17–427:10.) Plaintiff stated that when a medical director suspends a paramedic, the state's policy is that the employee should be downgraded to an EMT, but not removed entirely. (*Id.* at 426:2–10.) The City required Plaintiff to produce an EMT license to prove her qualification to perform as an EMT. (McCallister Decl. ¶ 5.) Plaintiff testified that she obtained a letter from the Florida Department of Health on February 4, 2008 stating that she could work as an EMT, but that Fire Chief Hawver would not accept it. (Smith Decl. ¶ 17.)  Chief McCallister stated that the City has no evidence that Plaintiff complied with the City's instruction. (McCallister Decl. ¶ 5.) The foregoing evidence creates a factual dispute as to whether Plaintiff could have continued working for the Fire Department, even if it was not as a paramedic. As such, a reasonable jury could infer that the City's proffered reason that it took adverse action against Plaintiff because she could no longer work as a paramedic is false and that the real reason was retaliatory.

As for the reason that Plaintiff has been subject to multiple suspensions in the past, Plaintiff introduced evidence that her previous suspensions were unfounded. As discussed above, Plaintiff presented evidence that she did not curse at the fire department administration and that she was not insubordinate. (Doc. 49-22, p. 8; Doc. 49-24, p. 16.) She also testified that the individual who made the complaint against her for her allegedly disruptive behavior during the hazardous materials class had made sexual advances at her that she turned down. (Smith Dep. 296:1–7.) Thus, a reasonable jury could infer that the City's posited reason that Plaintiff was indefinitely

suspended and terminated because of her past disciplinary history was pretextual.

Additionally, Chief McCallister told Smith that she could file a hostile work environment claim, but that it "would make [her] career very tough." (*Id.* at 162:1–13.) On October 24, 2007, Lieutenant Brian Grace told Smith that she had "a big target on [her] back" because of the complaints she made. (Smith Decl. ¶ 8.) Based on this evidence, a reasonable jury could draw the inference that the reasons proffered by the City were pretextual and that the real reason for the adverse action was retaliation. As such, summary judgment as to the retaliation claim is due to be denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant, City of New Smyrna Beach's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 47) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 24, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record