**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MELISSA SMITH,

        Plaintiff,

v.                                    Case No. 6:11-cv-1110-Orl-37KRS

CITY OF NEW SMYRNA BEACH,

        Defendant.

---

**ORDER**

This cause is before the Court on the following:

1.     Defendant, City of New Smyrna Beach's Motion for Judgment as a Matter of Law or, in the Alternative, Defendant's Motion for New Trial and Incorporated Memorandum of Law (Doc. 196), filed July 19, 2013; and

2.     Plaintiff's Response to Defendant, City of New Smyrna Beach's Motion for Judgment as a Matter of Law or, in the Alternative, Defendant's Motion for New Trial and Incorporated Memorandum of Law (Doc. 207), filed August 5, 2013.

Discrimination in the workplace anywhere in the United States is inconsistent with the concept of ordered liberty as first espoused by Thomas Jefferson in July of 1776. The Declaration of Independence (U.S. 1776). "Title VII is central to the federal policy of prohibiting discrimination in the Nation's workplaces and in all sectors of economic endeavor." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013). As we continue to strive toward "a more perfect union," U.S. Const. pmbl., first responders like the men and women of the nation's fire and rescue services have

become iconic symbols for America. They are rightly seen as modern day heroes and heroines who put service and the interests of others ahead of their own needs and personal safety. This case presented hotly disputed facts surrounding Plaintiff Melissa Smith's claims that the first responder department with which she was employed failed to live up to the standards imposed by Title VII. Based on its view of the evidence presented, the jury found that Defendant City of New Smyrna Beach ("the City") engaged in disparate treatment, created a hostile work environment, and retaliated against a female firefighter based on her gender. The Court finds no grounds to disturb the jury's verdict.

## BACKGROUND[1]

Plaintiff brought this suit under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act, alleging that throughout her career as a firefighter with the City's Fire Department, she was disparately treated based on her sex, subjected to a hostile work environment, and retaliated against when she complained to City personnel and management. (Doc. 1.)

Plaintiff worked at the Fire Department from 2003 to 2008. (Doc. 154, 227:14–15; Joint Ex. 8.) During her interview for the job, Fire Chief Tim Hawver told Plaintiff, "I only really hire men that hunt, fish, or camp. . . . But I heard you're a pretty good ball player." (Doc. 154, 188:18–21, 189:4–6.) He also discussed her role as a single mother. (*Id.* at 189:13–19.)

Upon Plaintiff's arrival at the Fire Department, she discovered that her Standard Operating Procedures manual had been covered with a Cosmopolitan magazine cover.

---

[1] These facts are drawn from the evidence presented at trial and are viewed in the light most favorable to Plaintiff. *See Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998).

(Doc. 158, 175:15–176:5; Pl. Ex. 5.)

Soon after Plaintiff started work, Battalion Chief Michael Coats told Plaintiff that he did not believe that women should be in the fire service and that it was Plaintiff's responsibility to prove otherwise. (Doc. 154, 197:17–20.) In general, Battalion Chief Coats "was more than happy to express his disinterest about women being in the fire service," such as by making "comments about them [not] being able to pull their own weight or do the job of a man." (Doc. 156, 197:1–4.) Plaintiff told Deputy Chief David McAllister about her interactions with Battalion Chief Coats, and Deputy Chief McAllister told her, "Well, it sounds like you have a hostile working environment. You need to file that." (Doc. 154, 238:5–11.) Deputy Chief McAllister also told her that if she did file, it would create a lot of trouble for her. (*Id.* at 239:12–13.)

Lieutenant Paul Owens told Plaintiff, "[W]e [don't] need another split tail around here."[2] (Doc. 155, 59:7–8; *see also* Doc. 156, 198:4.) There was other testimony that Lieutenant Owens felt that women could not do the job as well as men. (Doc. 156, 197:10–11.)

Lieutenant Cindy Richenberg, the only other female in the Fire Department at the time, told Plaintiff that to survive as a woman there, Plaintiff needed to keep her head down because her experience was going to be difficult. (Doc. 154, 200:17–201:12.) Lieutenant Richernberg told Plaintiff about a gender-related incident that she experienced and said that when she told management about it, she was blamed for it. (*Id.* at 215:23–216:6.)

Another woman, Jami Ryle, joined the Fire Department in 2005. (Doc. 156, 3:19–

---

[2] A "split tail" was explained as a derogatory term referencing the female anatomy. (*See* Doc. 155, 58:19–24.)

21.) Firefighter Ryle testified that she tried to be one of the guys, but some of the men made her feel like an outcast. (*Id.* at 35:13–16.) Lieutenant Owens would not allow Firefighter Ryle to perform certain jobs that male firefighters were allowed to perform. (*Id.* at 35:23–36:3.) On another occasion, Firefighter Ryle was the only firefighter made to apologize for having her gear on improperly when multiple male firefighters responding to the same scene also had their gear on improperly. (*Id.* at 41:5–20.)

Plaintiff was also disciplined differently from her male counterparts. For example, she was written up for leaving the fire station to eat lunch before a meeting when the male firefighter who ate lunch with her was not written up. (Doc. 154, 208:9–209:2.) Men at the Fire Department frequently used the computer for non-work-related activities (including searching for pornography)[3] and were not written up, but Plaintiff was written up for using MySpace. (*Id.* at 246:14–249:15, 249:20–21; Doc. 156, 16:23–25.) Plaintiff was also written up for improperly washing a truck that was not even dirty. (Doc. 154, 253:12–255:2.) On another occasion, it was Plaintiff's duty to wash the fire truck, but Lieutenant Frank Morris told Plaintiff that it had already been done and to go back inside. (*Id.* at 256:6–17.) When the crew noticed that the truck was dirty, Lieutenant Morris told Battalion Chief Wofford that he told Plaintiff that she did not need to clean the truck because he thought that it was already clean, but Plaintiff was written up anyway. (*Id.* at 256:6–257:8.) Men have left trucks dirty but have never been written up. (*Id.* at 254:16–21.)

Firefighter James Roberts made sexual comments to Plaintiff, such as "Oh, I'd like to bend you over," and invited her to a swingers' party. (*Id.* at 241:13–19, 242:15–

---

[3] There were pornographic magazines in the fire stations, but Plaintiff testified that they did not bother her. (Doc. 154, 202:24–203:8; Doc. 155, 62:10–13.)

20.) He also sent her pornographic videos.[4] (Doc. 156, 19:5–6.) After Plaintiff told him several times to stop, he eventually did. (Doc. 154, 245:5–10.) After that, Firefighter Roberts said that he no longer wanted to work with Plaintiff.[5] (*Id.* at 245:2–6.)

After Plaintiff got married in 2006, Deputy Chief McAllister and Fire Chief Hawver asked her multiple times when she was going to get pregnant. (Doc. 155, 12:12–15.) Deputy Chief McAllister told Plaintiff in front of her husband that he could not wait for her to get pregnant so that she could come to work as his secretary rather than as a firefighter. (*Id.* at 12:15–18; Doc. 157, 9:19–25.) He also commented to Plaintiff's husband, "Any time you want to come up to the station, I'll let you stop by for a few minutes," which, in the context of the conversation, Plaintiff's husband construed to mean that he should stop by to get her pregnant. (Doc. 157, 10:1–17.)

In July 2007, Plaintiff became pregnant and told people at the Fire Department about her pregnancy.[6] (Doc. 155, 12:19–13:3.) Battalion Chief Wofford told Plaintiff that Fire Chief Hawver was not happy about her pregnancy,[7] and Fire Chief Hawver ignored Plaintiff for the next several shifts. (*Id.* at 13:6–11.) Plaintiff was denied overtime from that point forward, which impacted her compensation. (*Id.* at 13:23–14:8.) She was also removed from the fire station where she had been working out of class as a driver/engineer (making more money) and placed at another fire station where she could only work as a firefighter/paramedic. (*Id.* at 14:12–15:6.) Though Plaintiff was at

---

[4] Firefighter Roberts also sent Firefighter Ryle sexually explicit text messages and photographs. (Doc. 156, 45:15–18.)

[5] Despite Firefighter Robert's conduct, Plaintiff considered him to be friend. (Doc. 155, 118:8–13.)

[6] Plaintiff ultimately suffered a miscarriage. (Doc. 155, 100:19–20.)

[7] The City argues that Fire Chief Hawver's statement is hearsay. (Doc. 196, p. 7.) However, a statement of a party opponent is not hearsay. Fed. R. Evid. 801(d)(2). Even if it were hearsay, any objection is waived because the City did not object during the testimony.

the top of the promotion list, men who had either failed the promotion test or who had never taken it were then assigned to work out of class in the vacant driver/engineer position.[8] (*Id.* at 14:25–15:4.)

In August 2007, Plaintiff was making lunch when she accidentally dropped a tuna can on the floor and said, "Shit." (*Id.* at 16:7–12.) Lieutenant Tyrone Ofide responded, "Ladies shouldn't talk like that. I don't know how your husband puts up with you. I can't wait to retire so I can tell you what I really think of you." (*Id.* at 16:17–23.)

On August 22, 2007, Plaintiff came to work in regular shoes before her shift began, and Driver/Engineer Scott Kirsch told her that policies would be changing and that she would no longer be able to wear regular shoes to work. (*Id.* at 23:17–22.) Plaintiff then said, "You can kiss my ass. I'm off—not even at work yet." (*Id.* at 24:5–7.) Lieutenant Ofide reported the interaction, and Plaintiff was written up and charged with cursing at the Fire Department administration. (*Id.* at 24:23–25:11; Def. Ex. 9.) She was ultimately suspended for the incident. (Doc. 155, 60:12–19.) Plaintiff testified that the cursing was merely directed at Driver/Engineer Kirsch, not at the administration.[9] (*Id.* at 188:9–18.) Multiple witnesses testified that men in the Fire Department regularly curse and have never been disciplined. (*Id.* at 26:21–27:18; Doc. 156, 42:8–10, 62:2–16, 203:1–5.)

Later on the day of the profanity incident, Plaintiff, Firefighter/Paramedic Michael

---

[8] Firefighter Ryle experienced similar treatment. The downtown fire station is typically the one staffed with four firefighters because it is the busiest and most central, while other stations are staffed with less. (Doc. 156, 39:3–20.) When Firefighter Ryle was scheduled to work as the fourth firefighter at the downtown station, a battalion chief switched her to another station even though it was an inefficient use of resources and contrary to normal operations. (*Id.* at 39:21–40:17.)

[9] Union President Roy Hodgins, who was involved with the grievance procedure regarding the profanity incident, also testified that the cursing was directed at Driver/Engineer Kirsch. (Doc. 156, 81:3–22.)

Gagliardi, and Lieutenant/EMT Ofide responded to a motor vehicle accident in which a truck rear-ended a bus. (Doc. 155, 29:22–25, 30:24–31:1.) Plaintiff was the lead paramedic. (*Id.* at 31:15–16.) At one point, Lieutenant Ofide told Plaintiff that a man in the truck needed to be extricated, which Plaintiff took to mean that Lieutenant Ofide and Firefighter Gagliardi were going to do so, as Plaintiff was tending to a man on the bus. (*Id.* at 42:24–43:11.) Several days later, Plaintiff was charged with insubordination after Lieutenant Ofide reported that Plaintiff had been insubordinate toward him. (*Id.* at 51:1–5.) However, Plaintiff was in charge of making medical decisions at the scene because she was the lead paramedic, rather than Lieutenant Ofide, who was merely an EMT. (Doc. 156, 145:4–146:6, 164:10–165:9.)

Around the same time, a driver/engineer asked Plaintiff to switch shifts with him, and they filled out the proper paperwork. (Doc. 155, 55:9–23.) Lieutenant Owens did not approve the shift switch because it would have put Plaintiff and Firefighter Ryle, another woman, on the same shift. (*Id.* at 56:3–8.) Lieutenant Owens stated, "I'm not working with two women" and "[I'm not] going to baby-sit two girls." (*Id.* at 56:10–22.) Lieutenant Owens proposed Firefighter Ty Tarnow as a replacement for the switch, even though—unlike Plaintiff—Firefighter Tarnow was not on the list to work out of class. (*Id.* at 57:1–5.) Lieutenant Owens received a letter of counseling for this incident. (Joint Ex. 14.)

About the same time, Plaintiff reported to the City's Human Resources ("HR") Director Carol Hargy that she was experiencing a hostile work environment. (Doc. 155, 57:20–58:16.) Additionally, throughout her time at the Fire Department, Plaintiff had talked to Fire Chief Hawver, Deputy Chief McAllister, Battalion Chief Wofford, Battalion Chief Don West, Lieutenant Brian Grace, Lieutenant Chris Dymond, Lieutenant Richenberg, Lieutenant Owens, Lieutenant Don Wiech, and Union President Roy

Hodgins about what she perceived to be harassment based on her gender. (Doc. 156, 23:25–24:13.)

In October 2007, after Plaintiff returned from her suspension for the profanity incident, Plaintiff was again moved to another fire station. (Doc. 155, 61:14–15, 64:21–22.) Lieutenant Grace told her that she had a "big target" on her back and that there were going to be new rules, namely, that she could not have "girly" magazines such as Glamour and Cosmopolitan in the fire station and that she was not permitted to bring tampons into the fire station but would have to change her tampons in her car. (*Id.* at 61:14–62:25.) Lieutenant Grace said that the no-tampons rule was at the direction of Battalion Chief Wofford. (*Id.* at 63:6–9.)

Plaintiff then received notice that a second investigation was being conducted in relation to the bus incident, this time for willful neglect in the performance of duties. (*Id.* at 65:5–11.) Plaintiff was shocked by this additional investigation and suffered an emotional breakdown due to the culmination of what she perceived to be harassment based on her gender. (*Id.* at 66:16–67:4.) Plaintiff again met with HR Director Hargy about how she was being treated. (*Id.* at 66:20–68:1.)

Fire Chief Hawver refused to meet with Plaintiff. (*Id.* at 68:13–16.) In December 2007, Plaintiff had another meeting with HR Director Hargy, City Manager John Hagood, and Union President Hodgins, during which Plaintiff recounted everything that had happened to her up until that time. (*Id.* at 68:6–24, 72:3–6.) At that meeting, when Plaintiff asked for clarification on the no-tampon rule, HR Director Hargy and City Manager Hagood told Plaintiff that they would have to check with the City's attorney about whether Plaintiff could bring tampons to work. (*Id.* at 70:20–23.)

At a meeting the following month, HR Director Hargy told Plaintiff, "Listen, we're

at a war of the worlds right now. How can we fix this?" (*Id.* at 80:22–81:10.) Plaintiff told her that sexual harassment training was needed, and HR Director Hargy responded that it was not in the budget. (*Id.* at 81:11–15.)

At this point, Plaintiff was experiencing panic attacks. (*Id.* at 84:11–16.) Her husband testified that her personality changed. (Doc. 157, 8:16–9:9.)

On January 16, 2008, Plaintiff was on duty when every time she entered a room, the others would leave and slam the door. (Doc. 155, 89:13–90:9.) Plaintiff was so distraught that she asked if she could go home early because she could not properly carry out her duties given her emotional state. (*Id.* at 90:10–15.) Plaintiff testified that Lieutenant Grace said, "Sure, after you scrub the toilets and make sure you get all the urine off the wall or you're going to do it again." (*Id.* at 90:10–18.) Plaintiff then proceeded to clean the toilets in tears while the other firemen on duty stood and watched her. (*Id.* at 90:19–21.)

That same day, based on Deputy Chief McAllister's representations and his investigation of the wrongful neglect charge in relation to the bus incident, Volusia County Medical Director Dr. Peter Springer suspended Plaintiff's ability to work as a paramedic until she completed three remedial requirements that Dr. Springer described as "not onerous." (Doc. 156, 100:12–16, 136:6–18, 137:11–16, 140:16–141:4.) Plaintiff completed two of the three requirements, but the City did not authorize Plaintiff to clear the third requirement. (*Id.* at 154:13–156:4.)

Two days later, Fire Chief Hawver suspended Plaintiff indefinitely without pay and forbade her from entering onto Fire Department premises. (Joint Ex. 8.) The indefinite suspension noted that a minimum requirement for working as a firefighter is EMT Certification. (*See* Joint Ex. 8.)

Plaintiff was still certified to work as an EMT. (Doc. 158, 175:7–17.) However, when she tried to present her EMT license to get back on active duty, she was not permitted on Fire Department premises to do so (*id.* at 175:21–23), even though a male firefighter who had been suspended and ultimately terminated was permitted on Fire Department premises. (Doc. 155, 88:14–89:4; Doc. 156, 94:22–95:11.) Plaintiff eventually provided copies of her EMT license to Union President Hodgins and HR Director Hargy and sent a letter to the Fire Department chiefs about her EMT status, but she was not permitted to return to work as an EMT. (Doc. 158, 175:24–176:5.)

On January 31, 2008, Fire Chief Hawver recommended Plaintiff's termination to City Manager Hagood. (*See* Joint Ex. 8.) Plaintiff was ultimately terminated. (*See, e.g.*, Doc. 155, 98:4–8.)

After a six-day trial, a jury returned a verdict in favor of Plaintiff on all of her claims. (Doc. 134.) The jury awarded Plaintiff compensatory damages in the amounts of $244,000 for back pay and $200,000 for pain and suffering. (*Id.*) The Court also granted Plaintiff's post-verdict request for reinstatement and ordered antidiscrimination training. (Doc. 183.) The City moved for judgment as a matter of law[10] or for a new trial and appealed the final judgment. (Docs. 196, 198.) Plaintiff opposed. (Doc. 207.)

---

[10] Though the City moved for judgment as a matter of law under Rule 50(a) at the close of Plaintiff's case-in-chief (Doc. 157, pp. 48–62), the Court considers the entire record on this renewed Rule 50(b) motion. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1305 n.31 (11th Cir. 1998); *see also Jacobs v. Penn. Dep't of Corr.*, No. 04-1366, 2009 WL 3055324, at *3–4 (W.D. Pa. Sept. 21, 2009) (explaining why the court considers the entire record). Even if the Court did not consider the entire record, the Court's conclusion would not change. The result would be the same without the evidence presented during the City's case or Plaintiff's rebuttal (which consisted only of the Cosmopolitan-covered manual incident and the City's refusal to allow Plaintiff to work as an EMT following her indefinite suspension).

## STANDARDS

### 1.  Judgment as a Matter of Law

A court may enter judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue. Fed. R. Civ. P. 50(a); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005). "[I]f there is a substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (citation and internal quotation marks omitted). The court may not weigh the evidence or decide the credibility of the witnesses and must view the evidence in the light most favorable to the nonmoving party. *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998).

Under Federal Rule of Civil Procedure 50(a), a party may move for judgment as a matter of law before the case is submitted to the jury. "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), "a party may renew consideration of issues initially raised in a pre-verdict motion for judgment as a matter of law." *Warfield v. Stewart*, 434 F. App'x 777, 780 (11th Cir. 2011) (quoting *Caban-Wheeler v. Elsea*, 71 F.3d 837, 842 (11th Cir. 1996)) (internal quotation marks omitted). However, because each party has a Seventh Amendment right to cure evidentiary deficiencies before her case goes to the jury, "a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1245 (11th Cir. 2001); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998).

**2. New Trial**

Federal Rule of Civil Procedure 50(b) allows a party moving for judgment as a matter of law to move alternatively for a new trial. The court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury to be contrary to the great weight of the evidence." *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988) (citation omitted). On a motion for a new trial, the judge may weigh the evidence. *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982) (citations omitted).

## DISCUSSION

**1. Judgment as a Matter of Law**

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination can take the form of either: (1) a discriminatory, tangible employment action; or (2) a hostile work environment that changes an employee's terms and conditions of employment. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010). Additionally, Title VII provides that it is unlawful for an employer "to discriminate against [an employee] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The City argues that there was no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff on her disparate treatment, hostile work environment, or retaliation claims. (Doc. 196, p. 2.)

### a. Disparate Treatment

The City argues that the only actionable adverse employment actions are Plaintiff's suspension for the profanity incident, her suspension for the bus incident, and her termination. (*Id.* at 7–10.) The City contends that for each of these adverse employment actions: (1) the decisionmaker imposing the adverse action lacked discriminatory animus; (2) no similarly situated comparator exists; and (3) Plaintiff failed to present sufficient evidence that the City's articulated reasons were pretextual. (*Id.*) Assuming *arguendo* that these are the only adverse employment actions that could give rise to a finding of disparate treatment, the Court nevertheless finds that Plaintiff presented sufficient evidence for a reasonable jury to conclude that she was subject to unlawful disparate treatment.

A plaintiff may prove a disparate treatment claim with circumstantial evidence, by presenting evidence: (1) sufficient to allow a jury to reasonably draw an inference of intentional discrimination; or (2) that meets the burden-shifting framework of *McDonnell Douglas. See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

Plaintiff presented circumstantial evidence that would satisfy either test. As for drawing a reasonable inference of intentional discrimination, Fire Chief Hawver acted as the decisionmaker, as he ultimately suspended Plaintiff for both the profanity[11] and bus incidents based on the results of investigations performed by Battalion Chief Coats. (Doc. 155, 60:17–24.) Given Fire Chief Hawver's statements during the hiring process,

---

[11] Plaintiff's suspension for the profanity incident was ultimately reduced from leave without pay to mandatory personal leave, which still caused Plaintiff to lose compensation. (Def. Ex. 62; Doc. 155, 70:13–15.)

and given the fact that he expressed displeasure with Plaintiff's pregnancy within mere months of the adverse employment actions (Doc. 154, 188:18–21, 189:4–6; Doc. 155, 12:12–15, 13:6–11), the Court finds that the jury had a sufficient evidentiary basis to conclude that the suspensions were the result of Fire Chief Hawver's intentional discrimination.

Even if the jury did not have a sufficient evidentiary basis to discern intentional discrimination on Fire Chief Hawver's part—which the Court concludes that it did—the jury also had a sufficient basis to conclude that Battalion Chief Coats intentionally discriminated. Under the cat's paw theory, "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to create an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011); *see also King v. Volunteers of N. Ala., Inc.*, 502 F. App'x 823, 828–29 (11th Cir. 2012) (applying *Staub* in the Title VII context). Where a decisionmaker other than the discriminatory supervisor imposed the adverse employment action, the employer is still liable if that decisionmaker relied on the supervisor's biased recommendation and did not independently determine that the adverse action was entirely justified. *Staub*, 131 S. Ct. at 1193. Battalion Chief Coats explicitly told Plaintiff that he did not believe that women belonged in the fire service, made comments about women not being able to pull the same weight as men, and frequently ignored Plaintiff while interacting with men normally. (Doc. 154, 197:17–20, 199:12–20; Doc. 156, 197:1–4.) Under *Staub*, the jury could have reasonably inferred that the suspensions were the result of Battalion Chief Coats's intentional discrimination, that Fire Chief Hawver did not independently investigate the profanity and bus incidents, and therefore that Plaintiff suffered unlawful

disparate treatment.

Alternatively, the jury could have reached the same conclusion under the *McDonnell Douglas* framework, which provides that a plaintiff makes out a prima facie case of discrimination if she shows that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) her employer treated her less favorably than other similarly situated individuals outside of her protected class; and (4) she was qualified for her job. *See McDonnell Douglas*, 411 U.S. at 802; *see also Marshall v. Mayor Alderman*, 366 F. App'x 91, 98 (11th Cir. 2010). When a plaintiff establishes a prima facie case of discrimination, it creates a rebuttable presumption that the employer acted illegally. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). The defendant can rebut that presumption with legitimate reasons for its action, and the plaintiff must then show that the proffered reasons were pretextual. *Id.* The City contends that Plaintiff failed to present sufficient evidence that there was a similarly situated comparator or that the City's articulated reasons for the adverse actions were pretextual. (Doc. 196, pp. 7–10.)

Plaintiff presented sufficient evidence that she was treated differently from similarly situated male comparators in regard to the profanity incident. There was ample testimony that everyone in the Fire Department curses on a regular basis. (Doc. 155, 26:21–27:18; Doc. 156, 42:8–10, 62:2–16, 203:1–5.) While the City contends that Plaintiff was disciplined not for mere cursing, but for cursing at the Fire Department administration, whether Plaintiff directed her profanity at the administration was a question for the factfinder. (*See* Doc. 71, p. 6.) The jury was therefore entitled to draw the conclusion that Plaintiff cursed only at Driver/Engineer Kirsch individually. Thus, every male in the Fire Department who curses is a similarly situated comparator. *See*

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

The City contends that it took the adverse actions because Plaintiff violated City policy, but the Court finds that Plaintiff presented sufficient evidence that this justification was pretextual. As previously discussed, a reasonable jury could have inferred gender animus on Fire Chief Hawver's part, thereby overcoming the City's proffered justification. Alternatively, given that Fire Chief Hawver suspended Plaintiff based on Battalion Chief Coats's investigation, the cat's paw analysis also satisfies the pretext requirement. *See Dombrowski v. Lumpkin Cnty.*, No. 2:11-CV-0276-RWS-JCF, 2013 WL 2099137, at *11 (N.D. Ga. Mar. 21, 2013) (applying the cat's paw theory in a Title VII sex discrimination case to the pretext consideration of the *McDonnell Douglas* framework); *Curtis v. Teletech Customer Care Mgmt. (Telecomms.), Inc.*, 208 F. Supp. 2d 1231, 1242–43 (N.D. Ala. 2002) (same in a Title VII race discrimination case). Additionally, Lieutenant Ofide—who reported Plaintiff's cursing—had recently told Plaintiff, "Ladies shouldn't talk like that" when she cursed in front of him on another occasion. (Doc. 155, 16:17–23.) The sum of the comments and conduct evincing general antipathy toward women in the workplace also supports a finding of pretext. Thus, the jury had sufficient evidence from which to conclude that the City's proffered reasons for the adverse actions were pretextual.

The Court therefore concludes that the jury had a sufficient evidentiary basis to conclude that Plaintiff suffered an unlawful adverse employment action. The motion for judgment as a matter of law is therefore due to be denied as to the disparate treatment claim.

### b.  Hostile Work Environment

At the outset, the Court notes that this case is not a paradigmatic sex-based

hostile work environment claim predicated on sexual harassment. Rather, Plaintiff's hostile work environment claim is primarily premised on a hostility toward the presence of women in the workplace. To prove a hostile work environment, a plaintiff must show: (1) that she is a member of a protected class; (2) that she was subject to unwelcome conduct; (3) that the conduct was based on her sex; (4) that the conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding her employer liable. *C.H. Robinson*, 594 F.3d at 808. The City argues that the jury did not have a sufficient evidentiary basis to conclude that the conduct to which Plaintiff was subjected was based on her gender or was sufficiently severe or pervasive to rise to the level of a hostile work environment. (Doc. 157, 55:3–8, 55:18–56:2; Doc. 196, pp. 11–15.)

### i.  Based on Gender

Much of the unwelcome conduct to which Plaintiff was exposed was overtly gender-based, and under the Rule 50 standard, the Court must defer to the jury's inference that other accompanying conduct was gender-based as well. From the beginning of her employment, various actors from all levels of the Fire Department told Plaintiff in one way or another that women did not belong in the fire service. (Doc. 154, 188:18–21, 189:4–6, 197:17–20, 198:13–15.) Upon her arrival, Plaintiff's Standard Operating Procedures manual was covered with a Cosmopolitan magazine cover. (Doc. 158, 175:15–176:5; Pl. Ex. 5.) Plaintiff was called a "split tail." (Doc. 155, 59:7–8.) She experienced sexual harassment when another firefighter sent her pornographic videos, invited her to a swingers' party, and told her, "Oh, I'd like to bend you over." (Doc. 154, 241:13–19, 242:15–20; Doc. 156, 19:5–6.) Plaintiff was asked multiple times when she would get pregnant and was told that she should get pregnant so that she

could work as a secretary. (Doc. 155, 12:12–18; Doc. 157, 9:19–25.) When Plaintiff cursed, she was told, "Ladies shouldn't talk like that." (Doc. 155, 16:17–23.) A lieutenant refused to work with Plaintiff and another female firefighter together. (*Id.* at 56:10–22.) The Fire Department instituted a rule forbidding "girly" magazines and tampons. (*Id.* at 61:14–62:25.) These comments and actions are all explicitly gender-based.

Additionally, the jury was entitled to infer that other unwelcome conduct was based on gender. *See Mich. Millers Mut. Ins. Corp.*, 140 F.3d at 921. The City contends that "[d]iscipline issued for policy infractions does not expose members of one sex to disadvantaged terms or conditions of employment to which members of the other sex are not exposed." (Doc. 196, p. 15.) It is true that the jury could have concluded that Plaintiff was subject to various investigations, inequitable discipline, and scheduling changes because she broke the rules or because of personality conflicts. However, the jury was equally entitled to believe that her treatment stemmed from her gender— especially when presented with evidence that men who committed the same alleged policy infractions were not investigated or disciplined and that the scheduling changes took place immediately after Plaintiff became pregnant, when Plaintiff was assigned to work with another woman, and in conjunction with the no-tampon rule. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."); *Marsh v. Ill. Cent. R.R. Co.*, 175 F.2d 498, 500 (5th Cir. 1949) (stating that a Rule 50 motion "raises a question of law only: Whether there is any evidence which, if believed, would authorize a verdict against movant"). Thus, based on both explicitly and contextually gender-discriminatory conduct, the jury had a sufficient evidentiary basis to conclude that the unwelcome

conduct to which Plaintiff was subjected was based on her gender.

### ii. Severe and Pervasive

"Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *C.H. Robinson*, 594 F.3d at 808 (citation omitted). The Court may consider: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The conduct must be both objectively and subjectively hostile. *Id.* at 21–22. Objective hostility involves "an environment that a reasonable person would find hostile or abusive." *Id.* at 21. "[T]he evidence of harassment is considered cumulatively and in the totality of the circumstances" and must be approached with "an appropriate sensitivity to social context." *C.H. Robinson*, 594 F.3d 798, 807–08 (citations and internal quotation marks omitted); *see also Dar Dar v. Associated Outdoor Club, Inc.*, 201 F. App'x 718, 722 (11th Cir. 2006) ("Breaking the alleged harassing conduct down act-by-act and then concluding that each act is 'isolated' is a bit like executing a self-fulfilling prophecy; every act viewed individually appears isolated.").

A reasonable jury could have concluded that the unwelcome conduct directed at Plaintiff intolerably altered her working environment. While the U.S. Court of Appeals for the Eleventh Circuit has set a high bar for the frequency prong, *see, e.g.*, *Mitchell v. Pope*, 189 F. App'x 911, 913–14 (11th Cir. 2006) (affirming summary judgment for employer where sixteen instances of offensive conduct took place over four years, though some conduct was not sex-based and many instances were merely "offensive utterances"), the inquiry "is not, and by its nature cannot be, a mathematically precise

test." *Harris*, 510 U.S. at 22. Here, the unwelcome conduct took place over the course of nearly five years. However, it escalated beginning in August 2007 when Plaintiff became pregnant. At that point, Plaintiff was denied overtime and moved to a station where she could not work out of class while unqualified men worked out of class in her place. (Doc. 155, 13:23–14:8, 14:12–15:6.) She was written up, investigated, and ultimately disciplined for the profanity and bus incidents—even though men in the Fire Department regularly curse and have never been disciplined and even though Plaintiff was the one in charge of making medical decisions at the scene of the bus accident. (Doc. 155, 24:23–25:11, 26:21–27:18, 51:1–5; Doc. 156, 42:8–10, 62:2–16, 145:4–146:6, 164:10–165:9, 203:1–5.) A lieutenant refused to work with "two girls." (Doc. 155, 56:10–22.) Plaintiff was then moved to another fire station, told that she had a "big target" on her back, and informed that new rules would be put in place, namely, that she could not have "girly" magazines and was not allowed to bring tampons to work. (Doc. 155, 61:14–62:25, 63:6–9, 64:21–22.) A second investigation into the bus incident was opened against her. (*Id.* at 65:5–11.) When Plaintiff asked to leave work because of her distress, she was forced to scrub the toilets while the men watched her. (*Id.* at 90:10–21.) Plaintiff's ability to work as a paramedic was revoked, she was suspended indefinitely, and when she tried to present her EMT license to get back on active duty, she was not permitted on Fire Department premises to do so, even though men who had been suspended were permitted on the premises. (Joint Ex. 8; Doc. 155, 88:14–89:4; Doc. 156, 94:22–95:11; Doc. 158, 175:21–23.) She was ultimately terminated. (Joint Ex. 8; Doc. 155, 98:4–8.) These escalating incidents over the last few months of Plaintiff's employment support a finding of sufficient frequency. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303–04 (11th Cir. 2012) (discussing how the

escalation of incidents toward the end of plaintiff's employment created a question of fact on the issue of severity and pervasiveness).

Furthermore, the unwelcome conduct was both humiliating and directed at undermining Plaintiff's competence to perform her duties. The discrimination did not just involve gender-derogatory comments and sexual harassment,[12] though there were a number of those incidents. It was also predicated on humiliating ad hoc "rules" such as not being allowed to bring tampons into her workplace and having to change her tampons in her car, and requiring Plaintiff to scrub toilets—including "get[ting] all the urine off the wall" while the men watched her—before she could leave work due to emotional distress from the hostility. (Doc. 155, 61:14–62:25, 89:13–90:21.) Further, from the time that Plaintiff arrived at the Fire Department and was blatantly told that women did not belong in the fire service, to the end of her tenure when a lieutenant openly refused to work with her because of her gender, her competence and ability to perform as a firefighter were constantly undermined. This culminated in a series of escalating investigations and inequitable disciplinary actions, which the jury reasonably could have inferred were based on false pretenses. *Cf. O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (noting that incidents of "work sabotage, exclusion, denial of support, and humiliation" can contribute to a hostile work environment). The

---

[12] The cases on which the City relies (Doc. 196, pp. 11–15) mostly deal with insufficiently severe or pervasive sexual harassment, *see, e.g.*, *Leeth v. Tyson Foods, Inc.*, 449 F. App'x 849 (11th Cir. 2011), which is not the centerpiece of Plaintiff's hostile work environment claim, or are inapposite for other reasons, *see, e.g.*, *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 807 (11th Cir. 2012) (finding that plaintiff did not subjectively perceive the harassment to be sufficiently severe or pervasive); *Thompson v. Carrier Corp.*, 358 F. App'x 109, 114 (11th Cir. 2009) (stating that plaintiff acknowledged that the harassment was not based on a protected characteristic but stemmed from her tendency to fall asleep on the job and litigation she pursued against a former employer).

propagation of gender-based skepticism as to the competence of a female firefighter in an overwhelmingly male occupation, and the repeated undermining of her abilities to perform acts as rote as washing a fire truck and as fundamental as triaging patients, interferes with work performance and goes to the core of her terms and conditions of employment. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 326 (5th Cir. 2004) (adding "whether the complained-of conduct undermines the plaintiff's workplace competence" as a fifth factor in weighing severity and pervasiveness); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (concluding that a female firefighter presented sufficient evidence to withstand summary judgment based in part on gender-derogatory comments that undermined her competence as a commanding officer); Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1769 (1998) ("[A] core component of [hostile work environment] harassment is conduct designed to undermine a woman's competence; the harassment does not always consist of sexual advances or other sexually oriented conduct.").

"Keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes," *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1524 (M.D. Fla. 1991), this Court finds that the jury had sufficient evidence to conclude that the hostile work environment was sufficiently severe or pervasive. Plaintiff subjectively understood the terms and conditions of her employment to have been altered, as evidenced by her emotional breakdown and panic attacks (Doc. 155, 66:16–67:4; 84:11–16), and a reasonable person in Plaintiff's position would have felt the same way. Thus, the Court cannot conclude as a matter of law that no reasonable jury could view Plaintiff's treatment as

severe or pervasive enough to alter the terms and conditions of her employment. The motion for judgment as a matter of law is therefore due to be denied as to the hostile work environment claim.

### c. Retaliation

Under 42 U.S.C. § 2000e-3(a), there are two types of statutorily protected activity that may form the basis of a retaliation claim: (1) activity stemming from the participation clause of the statute, which protects an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"; and (2) activity stemming from the opposition clause, which protects an employee who "has opposed any practice made an unlawful employment practice by this subchapter." In its Rule 50(a) motion, the City challenged Plaintiff's retaliation claim on the ground that her protected activity was not protected by the participation clause. (Doc. 157, 56:6–25.) In its Rule 50(b) motion, in addition to that issue, the City argued that under the opposition clause, Plaintiff failed to present evidence supporting a causal connection between her protected activity and the adverse employment action taken against her. (Doc. 196, pp. 15–18.)

Plaintiff presented her retaliation claim pursuant to Title VII's opposition clause by presenting evidence that she complained to the City's management and personnel about harassment based on her gender. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–12 (11th Cir. 2002) (stating that good faith, reasonable complaints that an employer was engaged in an unlawful employment practice are protected under the opposition clause). The City's participation clause argument is therefore unavailing. Further, because the City did not raise the opposition clause issue in its Rule 50(a) motion, it is waived. *See Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1245

(11th Cir. 2001).

Even if this argument were not waived, it would still fail. The U.S. Supreme Court recently held that a plaintiff making a retaliation claim must establish that her protected activity was a but-for cause of the adverse employment action.[13] *Nassar*, 133 S. Ct. at 2534. A plaintiff can prove a but-for causal relationship through a "close temporal proximity" between the time her employer learned about her protected activity and the adverse action. *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)) (explaining the but-for standard in an FLSA retaliation case). A three-month time span, "without more," is not close enough to demonstrate temporal proximity. *Cooper Lighting*, 506 F.3d at 1364 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Here, Plaintiff made multiple complaints to HR Director Hargy from August 2007 to January 2008 about the hostile work environment. (Doc. 155, 58:13–16, 66:20–68:1, 80:22–81:15.) This was the same period in which the investigations and disciplinary actions against Plaintiff escalated. In October 2007, Plaintiff was told that she had a "big target" on her back. (Doc. 155, 61:14–62:25.) Fire Chief Hawver suspended Plaintiff indefinitely without pay on January 18, 2008, and recommended her termination on January 31, 2008. *See* Joint Ex. 8. The Court concludes that the jury had a sufficient evidentiary basis from which to conclude that Plaintiff's complaints were a but-for cause of the adverse employment actions given the temporal proximity between Plaintiff's multiple complaints and her suspensions and termination, the comment that she had a

---

[13] This appears to be a higher standard than that previously employed by the Eleventh Circuit. *See, e.g.*, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (requiring that the protected activity and the adverse action be "not completely unrelated").

"big target" on her back, and the escalating nature of the investigations and discipline as Plaintiff continued to make complaints. The motion for judgment as a matter of law as to the retaliation claim is therefore due to be denied.

### 2. New Trial

The Court may grant a new trial on an issue "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The City moves for a new trial on three grounds: (1) the verdict is against the great weight of the evidence; (2) the Court's exclusion of the arbitration award was improper; and (3) an intervening change in the law has occurred, in that retaliation now requires but-for causation and the jury was improperly instructed on this requirement. (Doc. 196, pp. 18–22.) The Court concludes that a new trial is not warranted.

First, the verdict in favor of Plaintiff was not against the great weight of the evidence. This case involved highly disputed questions of fact. The jury had to determine, among other things, whether Plaintiff's cursing was directed at the Fire Department administration or an individual; whether Plaintiff was subject to various gender-disparaging comments and conduct; whether Plaintiff was disciplined where men were not because of her gender, because she broke the rules, or because of personality conflicts; and whether Plaintiff was suspended and terminated because she complained or because of poor performance. In light of the highly disputed facts, and in the absence of any complicated issues or pernicious events during trial, the Court cannot say that the verdict was against the great weight of the evidence. *See Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir. 1982). Rather, the jury reasonably resolved the factual issues in Plaintiff's favor. Thus, the Court concludes that the verdict is not contrary to the greater weight of the evidence.

Second, the Court properly excluded the arbitration decision. An "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974). Courts have interpreted this language to mean that a district court is not required to admit an arbitration decision. *See, e.g.*, *Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994) ("[T]here is no requirement that the court must allow an arbitration decision to be admitted at all." (citation omitted)). The Court excluded the arbitration proceeding out of concern that it would have "the imprimatur of being a judicial determination or a quasi-judicial determination of Title VII issues" (Doc. 155, 6:5–9) and that the jury would weigh its significance more heavily than other evidence. *See Bunge Corp.*, 40 F.3d at 246 (affirming a district court's exclusion of an arbitration decision based on the risk that "the arbitrator's decision and rationale would be substituted for the jury's decision"). Additionally, though the collective bargaining agreement included a nondiscrimination provision (*see* Doc. 49-5, p. 5), that provision was not considered by the arbitrator (*see* Doc. 49-33, pp. 14–16). *Cf. Alexander*, 415 U.S. at 60 n.21 (noting that relevant factors regarding the weight to be accorded an arbitral decision include the "adequacy of the record with respect to the issue of discrimination" and "existence of provisions in the collective-bargaining agreement that conform substantially with Title VII"). Thus, the arbitration decision was properly excluded under Federal Rule of Evidence 403.

Finally, the jury was correctly instructed on the causation element of Plaintiff's retaliation claim. The Court instructed the jury that "[f]or an adverse employment action to be 'causally related' to statutorily protected activities it must be shown that, but for the protected activity, the adverse employment action would not have occurred." (Doc. 133, p. 10.) Thus, the jury was properly instructed on this point. As all of the City's arguments

are unavailing, the motion for a new trial is denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant, City of New Smyrna Beach's Motion for Judgment as a Matter of Law or, in the Alternative, Defendant's Motion for New Trial and Incorporated Memorandum of Law (Doc. 196) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 16, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record